I.

203.

Deborah Fiderer

101 W. 12th St. #7P

New York, NY 10011

Telephone: 212-255-8295

JUDGE CARTER 12 CV 3269

IN THE UNITED STATES DISTRICT COURT

~~FOR THE~~ DISTRICT OF NEW YORK

SOUTHERN

D. F.

DEBORAH E. FIDERER

   Plaintiff

   vs.

UNITED STATES GOVERNMENT         )

DEPARTMENT OF DEFENSE,        )

DEPARTMENT OF JUSTICE,         )

CENTRAL INTELLIGENCE AGENCY ,    )   Case No.

AARON SORKIN, JOHN WELLS, MARY JEAN TOMLIN, )

NEW YORK POLICE DEPARTMENT,     )

BRYSON COOPERSMITH, SKYVIEW  OWNERS   )

CORPORATION, SILVIA DEMETER, STEVEN DEMETER )

   Defendants.         )

_____)

### A.  COMPLAINT

  COMES NOW the plaintiff, Deborah E. Fiderer, individually, pros se, and files this petition against the defendants as follows:

### B.  PARTIES

1. Plaintiff Deborah E. Fiderer, is an individual representing herself pro se, with residence located at 101 W. 12th St., New York, New York 10011.

2. Defendant, the United States Department of Defense, is a government entity with principle offices located at 1400 Defense Pentagon, Washington D.C. 20301 -1400. The United States Department of Defense may be served by and through its Secretary, Leon Panetta at his principle place of business: U.S. Department of Defense, 1400 Defense Pentagon, Washington, D.C. 20301 – 1400. Defendant, the United States Department of Defense, is hereinafter referred to as the same, "Department of Defense, or DOD."

I.

203.

3. Defendant, the United States Department of Justice, is a government entity with principle offices located at 950 Pennsylvania Avenue, NW, Washington, DC 20530 – 0001. The United States Department of Justice may be served by and through its Attorney General, Eric Holder, at his principle place of business: U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530 -0001. Defendant, the United States Department of Justice, is hereinafter referred to as the same, "Department of Justice or DOJ."

4. Defendant, the United States Central Intelligence Agency, is a government entity with principle offices located at Central Intelligence Agency, Office of Public Affairs, Washington D.C., 20505. The Central Intelligence Agency may be served by and through its Director, David H. Patraeus, at his principle place of business: U.S. Central Intelligence Agency, Office of Public Affairs, Washington D.C. 20505. Defendant, the United States Central Intelligence Agency, is hereinafter, referred to as the same, "Central Intelligence Agency or CIA."

5. Defendant, Aaron Sorkin, is a television writer and producer with residence located in the Los Angeles, California area, address unknown to the general public. Defendant, Aaron Sorkin may be served by and through his agent, Ari Emanuel, at his principle place of business located at: Endeavor Talent Agency, 9601 Wilshire Blvd., Third Floor, Beverly Hills, California, 90210. Defendant, Aaron Sorkin, is hereinafter referred to as the same, or Mr. Sorkin.

6. Defendant, John Wells, is a television producer with residence located in the Los Angeles, California area, address unknown to the general public. Defendant, John Wells may be served at his principle place of business located at: John Wells Productions Warner Brothers Television, 4000 Warner Blvd., Burbank, California 91522. Defendant, John Wells, is hereinafter referred to as the same, or Mr. Wells.

7. Defendant, Mary Jean Tomlin, is an actress with residence located at 3959 Longridge Ave., Sherman Oaks, California, 91423. Defendant, Mary Jean Tomlin may be served at her residence, located at 3959 Longridge Ave., Sherman Oaks, California 91423. Defendant, Mary Jean Tomlin is hereinafter referred to as Lily Tomlin or Ms. Tomlin.

I.
203.

8. Defendant, the New York Police Department, is a government entity with principle offices located at One Police Plaza, New York New York 10038 -1403. The New York Police Department may be served by and through its Police Commissioner, Raymond Kelly, at his principle place of business: The New York Police Department, 1 Police Plaza, New York, New York 10038 – 1403. Defendant, is hereinafter referred to as the same or "NYPD."

9. Defendant, Bryson Coopersmith, is a New York policeman, with residence located at 5800 Arlington Ave. #21F, Bronx, New York 10471. Defendant Bryson Coopersmith, may be served at his residence located at 5800 Arlington Ave. #21F, Bronx, New York, 10471. Defendant Bryson Coopersmith, is hereinafter referred to as the same, or Mr. Coopersmith.

10. Defendant, Skyview Owners Corporation,  is a New York cooperative with principle offices located at 5701 Arlington Ave., Riverdale, New York, 10471.  Skyview Owners Corporation may be served by and through its president, Steven Chait, at his principle place of business: Skyview Owners Corporation, 5701 Arlington Ave., Riverdale, New York, 10471.  Defendant is hereinfafter referred to as the same, or "Skyview."

11. Defendant, Silvia Demeter, is the co-owner of Spy Shops Incorporated, with residence located at 6526 168th St., Fresh Meadows, New York 11365. Defendant, Silvia Demeter, may be served at her business located at : 138 East 34th Street, New York, New York 10016.  Defendant, Silvia Demeter, is hereinafter referred to as  the same, or "Ms. Demeter."

12. Defendant, Steven (Stefan) Demeter is the spouse of Silvia Demeter , and co-owner of Spy Shops Incorporated, with residence located at 6526 168th St., Fresh Meadows, New York 11365.  Defendant, Steven Demeter, may be served at his business located at: 138 East 34th Street, New York, New York 10016.  Defenant, Steven Demeter, is hereinafter referred to as the same, or "Mr. Demeter."

C.  FACTS PERTAINING TO THE PARTIES

I.

203.

13. Plaintiff, Deborah Fiderer, is an individual resideing at 101 W. 12th St. #7P, New York, New York which is located in the Manhattan borough of New York City. She will be 54 years old in May.

14. Plaintiff, Deborah Fiderer, is a United States citizen. She is a former English teacher who currently works as a consultant on the internet.

15. Defendant, the United States Department of Defense is a department of the Federal government which oversees all military and defense operations. The Secretary of Defense, Leon Panetta, exercises authority, direction and control over the Department of Defense.

16. Defendant, the United States Department of Justice, is a federal executive department responsible for the enforcement of the law and administration of justice. The Department of Justice is led by Attorney General Eric Holder.

17. Defendant, the United States Central Intelligence Agency, is an executive agency whose primary function is to  gather national security intelligence. This intelligence gathering is performed by non-military commissioned civilian agents. The Director of the CIA, David Patraeus, oversees intelligence gathering activities.

18. Defendant, Aaron Sorkin, is a television writer and producer, who worked on the West Wing television show. Mr. Sorkin has an extensive criminal history, including over 20 years of illicit drug use and theft in the form of plagiarism. In April 2001, he was arrested for carrying cocaine and hallucinogenic mushrooms to Burbank, California airport as he was preparing for a trip to Las Vegas. He was subsequently indicted on federal drug charges. By his own admission , he smoked crack cocaine daily for years. He has a history of lying and by his own admission, lied continuously while using drugs. Mr. Sorkin is a multimillionaire with connections to high political figures. Mr. Sorkin's agent, Ari Emanuel, is the brother of Rahm Emanuel, former White House Chief of Staff to President Barack Obama. Mr. Sorkin has participated in numerous fundraisers for Barack Obama.

19. Defendant, John Wells, is a television writer and producer who worked on the West Wing television show. His television production company at Warner Brothers produced the West Wing television show.  Mr. Wells is a multimillionaire with close ties to President Obama. President Obama attended a Hollywood fundraiser held in his honor at Mr. Wells' home in August of 2010.

20. Defendant, Lily Tomlin, is an actress who starred in the West Wing television show using the unique name, Deborah Fiderer.  Ms. Tomlin has an extensive criminal history including illicit drug use, illegal wire tapping, stalking, making death threats, assault, drugging and videotaping individuals without their consent.  Plaintiff spoke extensively to Ms. Tomlin's former live in assistant, who informed plaintiff that the entire time the assistant worked and lived with Ms. Tomlin, in 1992 and 1993, Ms. Tomlin illegally wire tapped phones.  A detective informed plaintiff, that Ms. Tomlin hired Anthony Pellicano, to stalk another woman.  Assistant informed plaintiff that  in June 1992, Ms. Tomlin drugged and videotaped Elaine Garzarelli, without Ms. Garzarelli's consent.

21. Defendant, Bryson Coopersmith, is a New York policeman who has lived in the apartment above plaintiff for approximately six years. He moved to the apartment about the same time plaintiff moved in.

I.

' 203. '

22. Defendant, New York Police Department, is the law enforcement agency employing Bryson Coopersmith.

23. Defendant, Skyview, is a cooperative located in the Riverdale section of the Bronx. The cooperative requires board approval before anyone may move to the complex. All residents are given the imprimatur of the board. In addition, the board oversees the hiring and supervision of all maintenance personnel.

24. Defendant, Silvia Demeter, is the co-owner of Spy Shops incorporated located at 138 East 34th Street, New York, New York, 10016. She has an extensive criminal history including arrests in Florida in the fall of 2000, for forgery, credit card fraud, felony grand theft.

25. Defendant, Steven Demeter, is the co-owner of Spy Shops incorporated located at 138 East 34th Street, New York, New York, 10016. Mr. Demeter, like his wife, has a criminal history, with several arrests on his record. His father, who started the Spy Shop enterprise in Florida, was arrested on serious federal crimes including money laundering and was eventually deported from the country.

### D.  FACTS PERTAINING TO THE CASE

26. On May 22, 2002,Deborah Fiderer came home from teaching night school to find an message on her answering machine.

27. A friend, retired teacher, Florence Smith, had left a message on plaintiff's answering machine informing her that a new character had been introduced on the West Wing televsion show by the name of Deborah Fiderer. The character was played by the actress Lily Tomlin. At the time of the airing of this episode, Ms. Fiderer was the only individual in the United States with the name Deborah Fiderer.

28. The television character was an alcoholic , drug addict, gambler, with a criminal record , unable to get a security clearance. Ms. Fiderer was horrified as none of these traits were true of her. Warner Brothers own attorney at the time, Jody Zucker, off the record to Ms. Fiderers' attorney described the character as "despicable." In addition, there was no disclaimer on the television show stating that these characters are fictional and are not based on real people.

29. Deborah Fiderer knew immediately that Michelle Matthow, a 61 year old unemployed actress, Deborah Fiderer had met in January 2000, had given the name to the writers of the television show.

30. Ms. Matthow, had stated to Ms. Fiderer, that she wanted to attempt her hand at writing scripts for television. Deborah Fiderer inquired of Ms. Matthow, whether she had ever written anything before. Ms. Matthow stated, she couldn't write, but she had ideas for characters and she wanted to sell her ideas, specifically character names for a new television show she liked: The West Wing.

I.
203.

31. Ms. Matthow stated she wanted to meet John Wells, the producer of West Wing, to pitch her ideas – specifically names for characters.

32. On May 23, 2002, Ms. Fiderer spoke to an attorney, who informed her that in order to prove defamation of character, one must establish that the writers were cognizant of her existence before using the name.

33. Deborah Fiderer knew she had to establish a connection between Ms. Matthow and the television show.

34. On May 23, 2002, Deborah Fiderer contacted Diane Castellano, an investigator residing in Palm Springs, requesting assistance in finding a connection between the television show and Ms. Matthow.

35. Within one week, Ms. Castellano informed Deborah Fiderer that #1 – she was the only individual in the United States with the name Deborah Fiderer and #2 – the connection Ms. Matthow has to the show is through Lily Tomlin. She found the connection through various web site links. Since mentioning this to Deborah Fiderer, those links have been removed from the internet. At the time Ms. Fiderer spoke to Ms. Castellano, it never occurred to her her phone would be tapped. Now, however, she believes that all her conversations regarding this case were monitored from the beginning.

36. During this time period, Deborah Fiderer spoke with her brother , who coincidentally worked with a woman, Yaru Yang, who was friends with a cameraman, Eric Liebowitz, who worked on the West Wing television show.

37. Yaru Yang asked Eric Liebowitz how the show came up with the name, Deborah Fiderer, without alerting Mr. Liebowitz to her reason for inquiry.

38. Mr. Liebowitz stated that Lily Tomlin came up with the name and the character was based on Tomlin, as she has a history of drug use: specifically cocaine and marijuana, and her behavior is known to be erratic.

39. On June 1st, 2002, at 1:30 p.m. on Sunset Blvd. and the corner of Crescent Heights, Ms. Fiderer stopped her car for a red light while heading west. She was in the interior lane. While stopped, she noticed a woman in a Jetta in the outer lane swiveling her head around and gawking at Ms. Fiderer. The woman in the other car was Ms. Tomlin.

40. Ms. Tomlin stared at Ms. Fiderer with a ferocity which she found unnerving. It was clear to Ms. Fiderer that Ms. Tomlin was aware of who she was. This is the first time that Ms. Fiderer noticed Ms. Tomlin was watching her – but she now believes that Ms. Tomlin had been monitoring her prior to this incident. Prior to this time, no lawyers from Warner Brothers had been contacted on Ms. Fiderer's behalf. This date is significant, because during the fall of 2002, Ms. Tomlin and Aaron Sorkin claim, via their attorney that they had never heard of Ms. Fiderer or seen her.

41. In July 2002, Deborah Fiderer went to Brentano's book store in Century City, Los Angeles with a retired teacher, Rochelle Smithline to attend a book signing with Aaron Sorkin, the supposed creator of the West Wing television show. (He, in fact, plagiarized the concept of the show from the writer William Richert – who titled his show The Executive Wing.)

42. At the book signing, Deborah Fiderer, requested that Rochelle Smithline ask Aaron Soprkin how he came up with the name, Deborah Fiderer. Deborah Fiderer stood in back of Aaron Sorkin as he spoke. He stated that he needed a replacement for the Mrs.

I.
203.

Landingham character and initially considered Bea Arthur, but Lily Tomlin is a friend of his and petitioned him for the part and she came up with the name, Deborah Fiderer.

43. Aaron Sorkin's story dovetailed with Eric Liebowitz's story, i.e. that Lily Tomlin – not Aaron Sorkin introduced the name, Deborah Fiderer.

44. In September of 2002, Ms. Fiderer retained the law firm of Steven Beer to draft and send a cease and desist letter to Warner Brothers.

45. Beer's firm sent a letter to the producers of the West Wing asking the show to refrain from using the name Deborah Fiderer, Deborah Fiderer was caused great distress by having her unique name associated with a despicable character. At no time did she request any financial remuneration or notoriety.

46. The character first appeared on the season finale of 2002, and it would have been a simple task to change the name. In addition, Aaron Sorkin had a reputation for last minute script changes.

47. Warner Brothers' reply to the cease and desist letter was to mock Deborah Fiderer's concerns. They maintained non one would connect the television character with Ms. Fiderer. Dozens of people commented to plaintiff about the character's name and her name. Once, when Ms. Fiderer attempted to contact a lawyer via the internet, the lawyer's first response was, "Why are you using the name of the character on the West Wing?" Another time, when Ms. Fiderer contacted a head hunter in New York, the headhunter claimed, "No one will hire you with a name like that." Warner Brothers maintained that dozens of people have the name Deborah Fiderer – which is an unmitigated lie. Mr. Sorkin was adamant that he would not stop using the name.

48. Ms. Fiderer was not happy with her legal representation and switched firms in the fall of 2002, to Thomas Brackey in Beverly Hills.

49. Attorney Thomas Brackey sent Warner Brothers more letters, in an attempt to settle the matter without litigation. He again disputed their claims that there are numerous people with the name Deborah Fiderer and that no one would draw a connection between Ms. Fiderer and the character. Again, Mr. Brackey requested that Warner Brothers cease using the name.

50. In the fall of 2002, Jody Zucker, attorney for Warner Bros. maintained that neither Aaron Sorkin nor Ms. Tomlin had ever heard of or had met Deborah Fiderer. Ms. Matthow, however, had given plaintiff's name to Ms. Tomlin and plaintiff had seen Ms. Tomlin studying her, before any lawyers had been contacted.

51. Mr. Zucker maintained that Mr. Sorkin named the character after his fourth grade teacher to pay homage to her, and he used the first name Debbie to maintain continuity with the character of Debbie Dilaguardia.

52. When plaintiff read the script where the character is first introduced, it became clear to her that Aaron Sorkin was lying.

53. Ms. Tomlin's character is first introduced off screen as Miss Debbie DiLaguardia. She is repeatedlyh refered to as "Miss" Dilaguardia. It is clear that the producers/writers wanted this character to be single. When Tomlin's character first appears – she is referred to as "Mrs." Dilaguardia. Miss Dilaguardia was not married. You can't be married and single at the same time. When Tomlin is addressed as "Mrs. Dilaguardia," she corrects him and states that she is divorced now, and wants to go back to her

I.

203.

    maiden name, "Deborah Fiderer. " her maiden name was Miss Dilaguardia, not Fiderer. Not only was there no need to introduce the name Deborah Fiderer, into the storyline, it violates the continuity to introduce the name.

54. Aaron Sorkin's intent to degrade and humiliate Ms. Fiderer was so paramount, that even though it makes no sense to introduce the name Deborah Fiderer , he insisted on doing it and lied about his reasons for doing so.

55. During this period, (fall of 2002), Ms. Fiderer would see Ms. Tomlin in her vehicle, a white Lexus, crossing her path several times a week.

56. In January 2003, Ms. Fiderer noticed a Learning Annex catalogue listing Aaron Sorkin's appearance. Sorkin was slated to discuss the West Wing television show and answer audience questions. Ms. Fiderer called her attorney, Thomas Brackey, and mentioned she wanted to attend this lecture and ask Aaron Sorkin about his use of the name, Deborah Fiderer. Mr. Brackey agreed with Ms. Fiderer that it would be good idea to attend.

57. The class was slated for the next day and Ms. Fiderer called the Learning Annex to make a reservation. She was informed by the Annex, that Mr. Sorkin had cancelled at the last minute due to work scheduling conflicts and would be teaching the class at a later date.

58. Ms. Fiderer now believes, at the time this transpired, her phone was being tapped and Mr. Sorkin was informed that Ms. Fiderer was planning on attending the class. Mr. Sorkin never did teach the learning Annex class, despite the Annex's assurances he would.

59. In the spring of 2003, Ms. Fiderer, discussed an idea with a detective via her home phone. The detective would call Ms. Tomlin's production office on the pretext of discussing a script idea as a means of gathering information about how the West Wing got the name Deborah Fiderer. Ms. Fiderer repeatedly called and the detective repeatedly called Ms. Tomlin's office and the office never picked up the phone. Plaintiff believes Ms. Tomlin had been monitoring plaintiff's phone and was aware of her game plan.

60. Another indication that the plaintiff's phone was being monitored were the incessant harassing phone calls. The phone would ring and plaintiff would pick it up and respond only to have the other line hang up. Ms. Fiderer notified the phone company, who agreed to put a trap on her line. If the hang up calls were to occur again – she would alert the phone company. Oddly enough, during the two week period when the phone company monitored incoming calls there were no harassing calls. As soon as the trap was removed, the harassing calls recommenced.

61. On March , 2003, at 5:30 p.m. Ms. Fiderer was driving to work and stopped for a red light on Sunset Blvd. near La Cienega Blvd. She noticed Ms. Tomlin in the car behind her, sticking her tongue out, and making a mocking face. As soon as the light changed, Ms. Tomlin sped off. Ms. Fiderer realized that Ms. Tomlin didn't happen to randomly be behind her, but she was in fact following her.

62. A fellow teacher, Megan Belgarde, mentioned that Ms. Fiderer looked upset. Plaintiff confirmed that she had been followed by Tomlin and that she found it to be frightening.

63. Since March 5, 2003,Ms. Fiderer has been aware of being monitored by either Ms. Tomlin or one of her hirelings. The exception to this period was during November 2010,

I.
· 203. ·

> for a month or two when Ms. Fiderer hired a detective, Kevin Osborne, and the harassment temporarily stopped.

64. On either the second or third Friday in April 2003, at 4:30 p.m.,Ms. Fiderer was driving east on Pico Blvd. and stopped to make a left turn on Beverly Drive.  This time she noticed Mr. Sorkin driving Ms. Tomlin's car and Ms. Tomlin sitting in the passenger seat with a video camera.

65. On the West Wing television show, there was a character who was stalked – and Aaron Sorkin was possibly stalking Ms. Fiderer to study her reactions.

66. Ms. Fiderer was so unnerved at being followed, she called her brother from a pay phone at Century City shopping center and complained about being followed.

67. The following day, on Saturday, at 1:30 p.m., Ms. Fiderer was riding with her brother and while he was parking his car in a parking lot in Beverly Hills on Linden Drive, Ms. Fiderer saw Ms. Tomlin in the same parking lot, getting out of her white Lexus.  Ms. Fiderer stated to Tomlin, "Could you stop following me?!"  Ms. Tomlin had a bizarre smile on her face, and made a bizarre hand gesture.     Plaintiff walked away as Ms. Tomlin was not being responsive.

68. In the summer of 2003, Ms. Fiderer decided to leave her job and work as a substitute teacher at West Valley Occupational Center.  She felt it would be more difficult for Ms. Tomlin to monitor her if she had an irregular schedule.

69. It was during this period, that plaintiff realized that her phone was being monitored.  Ms. Tomlin would frequently show up to one of Ms. Fiderer's assignments before Ms. Fiderer would appear.  The only way she could have known when or where Ms. Fiderer was set to work would be by listening in on her phone calls.

70. Through investigation, Ms. Fiderer discovered that Ms. Tomlin had hired Anthony Pellicano to stalk other women on Ms. Tomlin's behalf.

71. In December 2004, Ms. Fiderer, went to the West Valley Police Station in Reseda, California to complain about Ms. Tomlin's stalking.  The sergeant she spoke to refused to write up a complaint – even though plaintiff was adamant that Ms. Tomlin had been stalking her.

72. In March, 2005, Ms. Fiderer decided to abandon pursuing her legal claim against the West Wing and move to New York.

73. Ms. Fiderer had expended a lot of effort and money to stop the unauthorized use of her name and had gotten nowhere.  Ms. Fiderer assumed that if she didn't pursue her claim and moved away, Ms. Tomlin would let her alone.

74. Ms. Fiderer's decision to move was fueled primarily by a desire to escape Ms. Tomlin's unrelenting and unceasing harassment.  Ms. Fiderer fully expected to be free of Ms. Tomlin while residing in New York.

75. Shortly after plaintiff moved to New York in March of 2005, as she walked north on 6th Ave. one evening, she spied a car following her out of the corner of her eye.  As she stopped at 13th St. , she looked over at the white van following her and saw Ms. Tomlin fiendishly grinning and waving.

76. Ms. Fiderer felt sick at the realization that Ms. Tomlin had no intention of stopping her illegal behavior.

I.

203.

77. As the days progressed, Ms. Fiderer noticed that in addition to periodic sightings of Ms. Tomlin – she was now followed by groups of individuals as opposed to one or two. This phenomenon is known as gangstalking.

78. Plaintiff left her apartment at various times in an effort to evade being surveilled. It didn't matter if she left at 2:00 or 3:00 in the morning or afternoon. She was followed whenever or wherever she went.

79. In September 2005, Ms. Fiderer came home to her apartment one afternoon to find that it had been entered. Her social security card, passport, teaching credential, resume, and other personal effects had been stolen. Ms. Fiderer became increasingly disheartened realizing Ms. Tomlin's bizarre fixation on her would not stop.

80. Ms. Fiderer began to experience extreme fatigue, but just assumed it was the result of her harrowing experiences with Tomlin.

81. Around January 2006, Ms. Fiderer, in a desperate attempt to secure more evidence to have Tomlin restrained, spoke to detective Ryan Mitchell. She was hopeful that maybe now, she could get free of Tomlin.

82. That evening, as she slept, she felt what could only be described as thousands of volts of electricity coursing through her body. She woke up sweating, with her heart racing, ringing in her ears, her extremities tingling, and an unbearable headache.

83. Every night henceforth, Ms. Fiderer, felt as if she were being electrocuted, but felt powerless to escape attack. She knew she was being assaulted and that Ms. Tomlin was responsible for the assaults – but she didn't know how the attacks were carried out.

84. The attacks increased in severity, such that Ms. Fiderer had debilitating migraines, saw flashes of light, had bloody noses, and felt bone crushing fatigue.

85. The assaults were so severe during this time, that Ms. Fiderer went to the emergency room on numerous occasions.

86. On her first visit to the emergency room, the attending physician insisted she be admitted to the hospital immediately, maintaining her symptoms were quite severe.

87. Ms. Fiderer refused to be admitted, but had a cat scan, which showed no abnormalities. Ms. Fiderer still felt horrible.

88. Ms. Fiderer became increasingly debilitated, often too weak to get out of bed.

89. Ms. Fiderer went to numerous doctors, who could not determine the cause of her symptoms.

90. In March of 2007, Ms. Fiderer took a trip to Los Angeles. During the entire trip, Ms. Tomlin and Mr. Sorkin repeatedly followed and stalked her. The show the West Wing was now off the air, Ms. Fiderer was not pursuing litigation, so there would be no discernible reason for Ms. Tomlin and Mr. Sorkin to continue their torment. It became clear to Ms. Fiderer at this point, that both Mr. Sorkin and Ms. Tomlin were psychopaths who derived pleasure out of seeing others suffer.  One day, in particular , was noteworthy.  In the first week of April, as Ms. Fiderer left the Oakwood parking lot in Woodland Hills, they ambushed her in the parking lot. They were both seated in a black Toyota, only this time, Sorkin was in the passenger seat.   This is the only time plaintiff saw him in the passenger seat, all other times he drove the car when they were together. They followed plaintiff to All American newsstand on Yarmouth in Encino. Then they followed plaintiff to Long's drugstore in Tarzana. As plaintiff maneuvered her

I.

203.

car to Reseda. Blvd. she attempted to videotape Tomlin, at which point, Tomlin started screaming an expletive laced rant at plaintiff like a maniac.     It was not unlike her screaming rant on the set of I heart Huckabee, where she coincidentally, plays a character who with her husband in the car, follows and monitors someone, not unlike her behavior with Sorkin when she monitored plaintiff.

91. Ms. Fiderer also noticed when she was in Los Angeles that she was constantly monitored by police. She felt that Ms. Tomlin was somehow responsible for this.

92. On February 23rd, 2009, Ms. Fiderer patronized the Spy Shop located at 138 E. 34th Street. The co-owner Silvia Demeter spoke with Ms. Fiderer. After Ms. Fiderer explained her situation, Ms. Demeter explained that she was under attack by electronic weapons and that she could help her devise a game plan whereby she could free herself of her ongoing torture. This was the first time Ms. Fiderer had ever heard of electronic torture and she realized quickly that Ms. Demeter was accurate. No other detective Ms. Fiderer had spoken with had mentioned this, so Ms. Fiderer, unfortunately put her trust in Ms. Demeter and had no awareness of Ms. Demeter's criminal history.

93. Ms. Fiderer was ecstatic as she finally thought Ms. Dmeter could appropriately advise her.

94. Ms. Demeter's husband, Steven Demeter, came to Ms. Fiderer's apartment five days later on the 28th and supposedly performed a security check, installed a security camera, and installed a device which supposedly neutralized electronic assaults, and prevented phone taps. Ms. Fiderer assumed her apartment was secure, and once again spoke freely on the phone with lawyers and others, unknowingly leaking information, as Ms. Fiderer later found out that Ms. Demeter went behind her back and contacted Ms. Tomlin and fed her all the information Ms. Fiderer gave her.

95. Ms. Fiderer followed Ms. Demeter's advice regarding mirrors in the windows and keeping the radiation neutralizing device on.

96. For about a month, during March 2009, Ms. Fiderer felt much better and surmised that Ms. Demeter had been accurate, that her symptoms had been caused by electronic torture. Since Ms. Demeter had initially been accurate, Ms. Fiderer placed her trust and confidence in Ms. Demeter.

97. Ms. Demeter presented herself as a security consultant with a degree from NYU, but in fact has no formal education and has never spent a day in a classroom – including elementary school.  Plaintiff later learned that Ms. Demeter has been arrested for forgery, credit card fraud, and felony grand theft.

98. Her husband Steven Demeter, also has a criminal record.

99. After about a month's reprieve of electronic toruture – the attacks started again from people on the street.

100.        Everywhere Ms. Fiderer walked, she was bombarded with gang members following her and aiming electronic devices at her. Once the device was aimed at Ms. Fidere and she was "zapped" she felt a debilitating migraine – as if she'd been kicked in the head. It was now virtually impossible to go out in public without being assaulted.

101.        In the summer of 2009, Ms. Fiderer went back to Ms. Demeter complaining that the harassment was worse than ever.   Ms. Demeter then confided that she had connections in law enforcement, who could help. Ms. Fiderer was skeptical, but she was

I.
203.

so desperate she didn't know where else to turn. In addition, none of the other avenues she sought for help were of any assistance, including numerous victim's rights organizations including Secure Horizons, an organization founded to help stalking victims.

102.     Ms. Fiderer told Ms. Demeter all the details of her case and Ms. Demeter assured her that she would help her.

103.     At this time, Ms. Fiderer started to notice a constant police presence around her. Everywhere she went – police cars would follow her – often slowly trailing her as she walked the street. Ms. Fiderer was completely unaware at this time that she might have a National Security Letter issued against her and Ms. Demeter told her the police presence was her law enforcement contacts helping out.

104.     At this time, Ms. Fiderer started to notice various sightings of Ms. Demeter as she walked about Manhattan. She thought it odd, but wasn't sure it meant anything unusual.

105.     In September of 2009, someone started spraying poisonous chemicals at Ms. Fiderer's front door. Ms. Fiderer complained at least three times to the security and filed a police report naming Ms. Tomlin as the person responsible for the biochemical attack.

106.     As a result of the chemical attacks, Ms. Fiderer installed a camera in her apartment through the peephole in the door. She soon came to realize that the maintenance workers, as well as her neighbors were responsible for spraying chemicals at her door. In addition, she noticed every single neighbor who passed her door, every single time they passed the door, directed an electronic device toward the door which emitted a flash of light. If Ms. Fiderer was in the vicinity of the door when they passed, she would be struck by a debilitating migraine. Ms. Fiderer realized that she was being assaulted all day long in her apartment in addition to being assaulted on the street. (Plaintiff has ample video evidence supporting claim.)

107.     The neighbors and maintenance individuals who have assaulted plaintiff include:Kathleen Bornschein #20M, Carol Pincus and her father Seymour Pincus #20G, Susan Turano and her boyfriend #20H, John Penge #20K, Peter Santaniello #20D, Anastasia Panos #20E, Vladamir Servianov #21G, Bryson Coopersmith #21F, Allen Levy #20J, maintenance workers: Euphemio Rojas, "Stevens," Angel, Teddy Rivera, Jose Mejia, Hector Vargas, cleaning woman Usha Drigipal. Plaintiff complained on several occasions to Jack Timlin the manager of the complex, including showing him video of maintenance workers directing
electronic weapons at her door.   Mr. Timlin assured her he would look into the matter, but the harassment continued unabated. It strains credulity not to believe that the management of Skyview is not only aware of the criminal assaults plaintiff is subjected to , but is complicit and condoning of them, when so many board approved residents and personnel are engaged in criminal behavior directed toward plaintiff.

108.     On February 20, 2010, at 1:00 p.m., as Ms. Fiderer was locking her door, someone came from behind and zapped her with an electronic weapon. She didn't say anything, but noticed the individual who assaulted her frequently hung out with another

I.

203.

tenant, Benita Raphan. Ms. Fiderer did a google search of Ms. Raphan and found that she was a feminist filmmaker who knew Tomlin and had made a movie with her . Plaintiff was excited as she felt she had finally  found a connection between the thugs and Ms. Tomlin.

109.        Ms. Fiderer reported her findings to Ms. Demeter and she assured her that this would enable her to get Tomlin.  A week later, when plaintiff went to check the internet site that had mentioned Ms. Raphan's connection to Tomlin, she noticed it was no longer on the internet.  The only person she had mentioned Ms. Raphan to was Ms. Demeter.  Ms. Fiderer realized in retrospect, that Ms. Demeter had alerted Tomlin, who subsequently had the website scrubbed from the internet.

110.        At this point, Ms. Fiderer started to see Ms. Demeter everywhere, and she came to realize that she must be on Tomlin's payroll. Ms. Fiderer did a criminal check on Ms. Demeter and found she had been arrested on serious charges.  Ms. Fiderer realized everything that Mr. and Ms. Demeter had been telling her were lies, and that Ms. Demeter had been videotaping her without her knowledge and consent and transmitting all the information to Tomlin.

111.        From September 3rd through September 7th ,2010, Ms. Fiderer went away. When she returned, she found both her and her parents' apartment had been entered and all the furniture, most notably the bed, had the stuffing gutted and replaced with strange padding.  Ms. Fiderer had made a special point of locking the windows and when she returned, the window locks had all been broken.  In addition, a box containing evidence regarding her case was missing.  She checked the film of the video from the front door and surmised, that entrance had been made through the window.  Ms. Fiderer called the police and two policewomen came out to investigate.  When Ms. Fiderer showed them the broken locks on the window, they refused to believe that anyone would have climbed in the window as there is no balcony and refused to take her police report.

112.        During this time, Ms. Demeter became increasingly brazen in her surveillance. Not only was she surveiling Ms. Fiderer, everywhere, she also directed electroniwespons at Ms. Fiderer while she was in her car.

113.        On November 8, 2010, Ms. Fiderer retained the private investigative firm, Private Eye 1st class and hired Kevin Osborn to investigate claims of harassment.

114.        Ms. Fiderer gave Mr. Osborn a list of names of individuals in her building, both maintenance workers and neighbors whom she felt to be involved in the gang stalking. In addition, she asked that Mr. and Mrs. Demeter be investigated.

115.        On November 12th, 2010, @ 5:30 p.m. when Ms. Fiderer was walking form the garage to the basement in her building, she noticed Silvia Demeter's son waiting by the entrance to the basement.  As Ms. Fiderer approached the door, he assaulted her with an electronic weapon.  When she realized what he had done, he ran off before she was able to photograph him.

116.        Beginning November 13th 2010, all harassment ceased.  No one followed Ms. Fiderer, no one sprayed cheimcals at her door, no one assaulted her with electronic weapons.  It was a marked change  as previously, the surveillance and electronic torture

I.
203.

was ongoing 24/7. Especially noticeable was the surcease of electronic torture from Ms. Fiderer's upstairs neighbor, policeman, Bryson Coopersmith.

117.     Ever since Ms. Fiderer moved into the apartment – she heard ongoing construction work in the apartment above her – constant drilling and hammering. Then every night – she would hear some sort of machine making a loud, rumbling noise placed right above her. When Ms. Fiderer moved, the machine would also be moved to the exact spot where Ms. Fiderer was located. Unless Ms. Fiderer shielded herself at night with heavy blankets, and sleeping under wooden tables – she would wake up with radiation burns on her body.

118.     By mid November, 2010, Mr. Osborn had spoken to the various individuals Ms. Fiderer had singled out as being connected to the ongoing harassment. Mr. Osborn stated to Ms. Fiderer that every person he talked to was shady and absolutely involved in criminal activity.

119.     Ms. Fiderer felt the fact that all harassment stopped as a result of Mr. Osborn questioning suspiects, indicated that indeed, these individuals were response ble for harming Ms. Fiderer and were all in communication with one another.

120.     After a couple of months of freedom, Ms. Fiderer once again experienced being surveilled and electronically harassed. Ms. Fiderer asked Mr. Osborn to intervene and again he spoke to the perpetrators, who again ceased all harassment. (January 2011)

121.     In February 2011, Ms. Fiderer met with Mr. Osborn for an hour to discuss the case. He inquired whether Ms. Fiderer had closed her email account. She repoled she hadn't. Mr. Osborn stated that when he attempted to email her, to confirm the meeting – a message came back stating that her account had been closed. The account, however, was still active. Perps were monitoring my email exchanges with Mr. Osborn and were apprised of his activities. Ms. Fiderer once again, asked Mr. Osborn about the various neighbors and he agreed that the people she suspected of involvement were, in fact criminals. When she further questioned him, as to how he knows they are criminals, he stated that he had been a DEA cop for 25 years and knows a criminal when he sees one. He mentioned one neighbor in particular, Susan Turano. He said that when he talked to her she was shaking like a leaf and that innocent people don't act the way she and her boyfriend did.

122.     In early April 2011, Ms. Fiderer contacted Cathie Meadows, a licensed mental health professional who specializes in counseling targeted individuals. She confirmed that Ms. Fiderer was indeed the victim of gang stalking , electronic torture, and biochemical weapons.

123.     On April 11th, 2011, ms. Fiderer was heartbroken to find out that Kevin Osborn had died of a heart attack. In addition to the devastation that she felt at losing someone she genuinely liked and acared about, she was worried that the defendants may have harmed him. Once, when the plaintiff told Ms. Demeter that she was worried that Tomlin was going to kill her, Ms. Demeter replied, "If she wanted to kill you, she would have killed you by now." She then claimed she could kill someone and make it look like a heart attack and no one would ever know.

124.     Mr. Osborn had been interviewing Ms. Demeter at the time he died.

I.
203.

125.     On June 12th, 2011, Ms. Fiderer consulted Stephen Seiden, an attorney, accountant, and investigator to discuss her case.

126.     On June 16th, 2011, Ms. Fiderer noticed that helicopters were circling her apartment every evening between midnight and six in the morning. Ms. Fiderer called the FAA and they said the aircraft is law enforcement and there was nothing she could do.

127.     Whenever Ms. Fiderer went near a window when the aircraft hovered, she was bombarded with radiation. She felt nerve tingling throughout her body, aches in all her joints, and ringing in her ears.

128.     It was very evident to Ms. Fiderer that this new development was a reaction on the part of Ms. Tomlin and her cohorts, to plaintiff seeking legal counsel.

129.     In August 2011, Ms. Fiderer contacted Joan Heffington of the Association for Honest Attorneys (AHA!) to discuss her dire circumstances. Ms. Heffington suggested that her name was probably put on a National Security letter, hence the military involvement in harassing her. This was the first time Ms. Fiderer was aware that her name had been placed on a National Security letter giving the government carte blanche to invade every sphere of her life and torture her to death.

130.     The AHA! Helps individuals file their own lawsuits and they suggested that the only way to get this nightmare to stop would be to file a federal lawsuit. AHA! believes that once a public record has been made regarding the ongoing torture it protects targeted individuals from being murdered.

131.     The AHA! Suggests initially sending out contact letter to the Department of Defense, the Department of Justice, the CIA, and others in an attempt to avoid litigation. Plaintiff's contact letter stated the various civil and criminal violations that are being committed and Ms. Fiderer's intent to pursue litigation, unless all violations cease.

132.     Ms. Fiderer sent out contact letters to the DOD, FBI, And DOJ on September 1st, 2011. On September 6th all harassment ceased including aircraft surveillance and electronic harassment. Ms. Fiderer surmised that her contact letters had reached some governmental authorities who had put out the word to stop harassment. Ms. Fiderer called the AHA! About her positive results.

133.     Ms. Fiderer's elation was shortlived, however. On September 12th, Mr. John Wells, the producer to the West Wing television show revceived her contact letter and within an hour of receipt of her letter, she noticed military aircraft thundering by her apartment windows. Now, instead of aircraft hovering in the evening, she experienced harassing aircraft night and day.

134.     On September 11th, 2011, Ms. Fiderer began an email correspondence with William Richert, a Hollywood writer, director, and producer. Mr. Richert is the actual inspirator of the West Wing television show but his material was plagiarized by Aaron Sorkin, who deprived Mr. Richert of any writing credit.

135.     Ms. Fiderer alerted Mr. Richert to her experiences with Mr. Sorkin and the West Wing imbroglio. Mr. Richert requested permission to post Ms. Fiderer's emails on his website. When Ms. Fiderer attempted to respond to Mr. Richert in the affirmative, her emails were prevented from going through. She attempted to respond to Mr. Richert using four separate email addresses and none of her emails would go through.

I.
203.

136.    It was clear to Ms. Fiderer that her emails were being monitored and intercepted.

137.    Eventually, Ms. Fiderer sent a response to a different email address.

138.    When Mr. Richert attempted to respond to Ms. Fiderer, his website was shut down, and all the material Ms. Fiderer had sent Mr. Richert wa deleted. It was clear to MR. Richert that the West Wing camp did not want their nefarious dealings to be made public.

139.    Ms. Fiderer also responded to a youtube video noting that Mr. Sorkin plagiarizes other writers and that video and her comments were also deleted.

140.    November 10th, 2011, Ms. Fiderer sent a complaint letter to the NYPD internal affairs detailing Bryson Coopersmith's criminal behavior.

141.    December 18th, 2011, Ms. Fiderer spoke with Cathie Meadows, M.A. She advised her not to speak to the NYPD internal affairs, claiming that a client of hers had been murdered after she filed a complaint about a policeman.

142.    January 13th, 2012, someone entered plaintiff's apartment and stole her father's computer which contained all of her files regarding the West Wing lawsuit.

143.    On January 31st, 2012, all files on plaintiff's older computer were deleted.

144.    Februrary 2nd, 2012, 5:30 p.m. Sergeant Vaughn and another policeman came to the door of Ms. Fiderer unannounced asking to speak about Mr. Coopersmith. Ms. Fiderer had been bathing when they called and was not dressed to speak. Ms. Fiderer spoke to Ms. Vaughn the following day by phone at around 3 p.m. Ms. Vaughn assured her that she would do everything in her power to help her, yet there was no abatement in Mr. Coopersmith's harassment after the phone conversation.

145.    On March 29th, 2012, Ms. Fiderer fell asleep around 7:00 a.m. When she awoke, she felt drugged and noticed needle marks and circular wounds all over her body. She felt puncture wounds all over her scalp and noticed her bodfy looked strange and misshape3n. When she went to sleep she had weighed 160 pounds. 3whe she awoke she weighed 143 pounds. Whe she washed her body and face, she was horrified to see that fat, cartilage and bone had been harvested from her body. Her nose had puncture marks , and the cartilage had collapsed , making it difficult to breathe. Her ears had puncture marks (she has never had her ears pierced) and had been scraped raw on the inside. Her diaphragm felt hard, and she realized the cartilage in her sternum had been removed, making it difficult to breathe, as her diaphragm had no elasticity. The cartilage between her ribs had been removed, fusing the ribs together, making her rib cage like a vise, which was crushing her internal organs. Her breasts had puncture wounds and appeared to have fat removed. Her eyes were sunken in their sockets and bloodshot. Her throat had cartilage removed, making it difficult to speak or swallow. It was clear to her that when she slept, someone had entered her apartment, and drugged her and used some sort of surgical instrument to harvest fat, collagen, cartilage, and bone from her body. This heinous act was committed by someone entering via the window, as the front door had a camera and was checked. They could only have entered from an apartment above or below.

I.
203.

146.     Ms. Fiderer's claims regarding her body being mutilated are supported by doctor reports and MRI's. The extreme assault was retaliation against Ms. Fiderer because she planned to file a lawsuit exposing the defendants' acts involved in her torment.

147.     This complaint is filed timely, according to the two year statute of limitations for fraud and conspiracy claims. Ms. Fiderer was not cognizant that she had fraud claims until she spoke to AHA! In August of 2011. It was at this point that she fully comprehended the defendants involvement through the use of a National Security Letter, when the Patriot Act went into effect.

148.     After September 11, 2001, President Bush and the government illegally used the National Security Letter against innocent citizens as a means of stifling their behavior. Anyone with money or political connections was able to keep innocent people under constant surveillance and subjected to various forms of torture.

149.     The Department of Defense, the CIA, and the Department of Justice and the other defendants used outrageous conduct in an attempt to stifle Ms. Fiderer from exposing Ms. Tomlin, Mr. Sorkin and Mr. Wells' continuous harassment. Such acts are deemed in terrorem populi – "to the terror of the people" and are utterly unconscionable.

150.     Using the NSL, the defendants have engaged in abuse of power, obstruction of justice, intentional emotional distress, bodily harm, and outrageous government conduct toward Ms. Fiderer.

151.     The defendants Silvia Demeter, Steven Demeter,  Skyview, NYPD, and others engage in fraud, conspiracy, and collusion by presenting themselves as having Ms. Fiderer's best interests at heart. Ms. Demeter conspired with Ms. Tomlin and illegally surveilled and assaulted Ms. Fiderer. Skyview employed workers who gassed Ms. Fiderer with poisonous chemicals, utilized electronic torture methods, and allowed residents to illegally surveil and torture Ms. Fiderer. Kathleen Bornschein, #20M has a wireless camera in the wreath on her door, which directly faces plaintiff's door. This makes for easy monitoring of Ms. Fiderer. The NYPD was apprised of Mr. Coopersmith's behavior, yet there was no cessation of harassment from Mr. Coopersmith.

152.     Plaintiff's right to Privacy under the Fourth Amendment to the United States Constitution was violated once the government her by issuing a National Security Letter against her.

153.     Criminal fraud and conspiracy to torture, maim, and murder charges should have been brought against the aforementioned defendants. The State, however, has refused to press charges.

154.     The actions of the defendants have caused Ms. Fiderer intentional emotional distress and enormous suffering.

155.     Plaintiff is without legal counsel, as she was unable to secure an attorney due to the claims in this case. The Doctrine of special circumstances applies in regard to her pro se status, and she should not be held to the same standards as attorneys.

156.     Plaintiff, Deborah Fiderer, brings this suit in federal court which has proper jurisdiction due to the defendants' violations of federal law.

I.

203.

157.     Deborah Fiderer has filed this complaint individually, and continues to be unlawfully persecuted through the National Security Letter which was issued and enforced by local/State/National government agencies.


### E.   LAW AND ANALYSIS


18 USC 242.

158.     Defendants in this matter violated numerous city, county, state, and national laws, statutes, ordinances and regulations, including but not limited to: civil conspiracy/collusion, fraud by commission, fraud by omission, misrepresentation/concealment, intentional fraud, trespass, defamation, detrimental reliance, outrageous conduct causing severe physical and emotional distress (tort of outrage) war crimes/crimes against humanity and attempted murder.  Defendants engaged in abuse and misuse of power, obstruction of justice, and outrageous government conduct.  They violated the plaintiff's inalienable right to "life, liberty, and the pursuit of happiness," under the Declaration of Independence , and Color of Law 42 USC 1983/USC 242.

159.     The United States District Court for the District of New York has jurisdiction in this matter since defendants violated federal laws and issued a National Security Letter against the plaintiff without a warrant and without probable cause.


#### A.  Civil Conspiracy/Collusion

160.     The defendants participated in a concerted effort to defame Deborah Fiderrer and cause her intentional emotional and physical distress by stalking and electronically harassing her.

161.     The brazen acts engaged in by all defendants to cause the plaintiff severe physical and emotional distress include, but are not limited to: harassing telephone calls, monitored telephone calls, 24 hour surveillance, daily chemical assaults, daily electronic and radiologic assaults, monitoring and intercepting all email transmissions, monitoring all banking transactions.  Defendants were involved in the overt act of issuing a National Security Letter with a flagrant disregard for human life.  Defendants helped carry out the National Security directives including attempts to kill Ms. Fiderer in an inconspicuous manner.

162.     The conduct of all the defendants to utilize a National Security Letter to illegally torture/maim and attempt to kill in an inconspicuous manner constitutes civil conspiracy/collusion.

I.

203.

163. By participating in a plan to cause the plaintiff's emotional distress, bodily harm and/or death, the conduct of the defendants constitutes conspiracy to cause harm to the plaintiff.

164. As a result of the conspiracy/collusion of the above named defendants, plaintiff has been damaged in excess of $250,000.00

165. Wherefore, plaintiff respectfully requests a judgment of the court against the above named defendants awarding to plaintiff (i) damages in excess of $250,000.00; (ii) pre-and post judgment interest; (iii) costs including reasonable attorney fees, for this action; (iv) injunctive relief enjoining the defendants from continuing their harm and (v) any other relief deemed jujst and equitable by the court.

### B.  Fraud by Commission

166. The above defendants' conduct in participation of the schemed plan constitutes a deliberate misrepresentation of the facts in an attempt to get the plaintiff to act to her detriment. The overt acts of fraud engaged in by the defendants toward plaintiff include, but are not limited to:videotaping, telephone calls, meetings, verbal communications, following her, assaults, and unwarranted and illegal issuance of a National Security Letter against her.

167. At all relevant times, the above defendants' participation in acts of a schemed plan to cause plaintiff severe emotional distress, bodily harm and/ or death, was willful and deliberate, with full knowledge and understanding that such conduct was substantially certain to result in injury and or death.

168. The  defendants' conduct constitutes fraud by commission.

169. As a result of the defendants' fraud by commission, plaintiff has been damaged in excess of $250,000.00.

170. Wherefore, plaintiff respectfully requests a judgment of the court against the above named defendants awarding to plaintiff (i) damages in excess of $250,000.00; (ii) pre- and post judgment interest (iii) costs, including reasonable attorney fees, for this action, (iv) injunctive relief enjoining the defendants from continuing their harm, and (v) any other relief deemed just and equitable by the court.

### C.  Intentional Fraud

171. At all relevant times, the appropriate defendants recognized that their fraudulent, overt acts (including, but not limited to :24 hour surveillance, the issuance of a National Security Letter) would result in mental anguish and severe bodily harm to Ms. Fiderer.

172. The defendants' conduct was to inflict emotional distress, and physical harm on plaintiff by abusing their power.

173. The conduct of the defendants constitutes intentional fraud.

I.

203.

174.     As a result of all the defenants' 9intentiaonal fraud, plaintiff has been damaged in excess of $250,000.00.

175.     Wherefore, plaintiff respectully requests judgments of the court against all defendants awarding to plaintiff (i) damages in excess of $250,000.00 for each defendant (ii) pre-and post judgment interest; (iii) costs, including reasonable attorneys' fees, for this action; and (iv) any other relief deemed just and equitable by the court.

D.Misrepresentation/Concealment

176.     The defendants' participation in the calculated plan to cause Ms. Fiderer severe and prolonged emotional distress, bodily harm and/or death constitutes a knowing misrepresention of the truth and concealment of material facts to induce plaintiff to act to her detriment.

177.     Mr. Timlin pretended to be concerned about the harassment plaintiff was subjected to, all the while being an active participant in the scheme.

178.     Ms. Demeter's offer to help Ms. Fiderer by pretending to contact law enforcement constitutes misrepresentation/concealment.

179.     Ms. Demeter's suggestion that
she may freely speak on the telephone because her line is secure constitutes misrepresentation/concealment.

180.     Mr. and Ms. Demeter's suggestion that her apartment is secure and free of all listening and photographic devices constitutes misrepresentation/concealment.

181.     Ms. Demeter's suggestion that Ms. Fiderer refrain from contacting other detectives because she is actively working on her case with law enforcement constitutes misrepresentation/concealment.

182.     At all relevant times, the plaintiff believed and relied on the fact that the appropriate defendants were acting in good faith, and believed she was being told the truth.

183.     At all relevant times, the plaintiff was unaware of the defendants' participation in the schemed plan to cause her emotinaol distress, bodily harm and /or death as they acted with willful rendering of imperfect performance in their respective positions.

I.
203.

184.     The defendants' participation in the calculated plan to cause the plaintiff
         emotional distress, bodily harm and/or death was with the intent and full knowledge
         that their conduct was certain to result in injury, detriment, and or death to the plaintiff.

185.     By participating in the calculated plan to cause plaintiff emotional distress, bodily
         harm and/or death, the conduct of the appropriate defendants constitutes
         misrepresentation/concealment.

186.     As a result of the defendants' misrepresentation/ concealment, plaintiff has
         been damaged in excess of $250,000.00.

187.     Wherefore, plaintiff respectfully requests judgments of the court against the
         above named defendants awarding to plaintiff: (i) damages in excess of $250,0 00.00;
         Pre-and post judgment interest; (iii) cost, inclujding reasonable attorneyh's fees, for this
         action; (iv) injunctive relief enjoining the defendants from continuing their harms: and (v)
         any other relief deemed just and equitable by the court.


                    E.Gross Negligence

188.     The failure of the government, the state, and others to give plaintiff the proper
         standard of care required of government leaders/state actors so that National Security
         Letters are not issued against innocent people constitutes gross negligence.

189.     The government has a duty under law to protect the innocent and to prosecute
         the appropriate defendants and others, and they have thus far failed to do so.

190.     As a result of the gross negligence of the above named defendants, plaintiff has
         been damaged in excess of $250,000.00.

191.     Wherefore, plaintiff respectfully requests a judgment of the court against the
         defendants awarding to plaintiff (i) damages in excess of $250,000.00 (ii) pre-and post
         judgment interest; (iii) costs, including reasonable attorney fees, for this action; and (iv)
         any other relief deemed just and equitable by the court.


                    F.   Tresspass

192.     Defendants hired criminals to continually enter residence and steal personal
         effects that only a sexual predator, such as Ms. Tomlin would have any interest in.

193.     Defendant Bryson Coopersmith continually allowed criminals to enter from his
         apartment #21F into my apartment #20F, and assault and drug Ms. Fiderer while she was
         sleeping. The most egregious act occurred on March 29th, 2012, when someone entered
         and harvested cartilage, bone, and fat from plaintiff's body necessitating corrective
         surgeries. In addition, many personal items were stolen including irreplaceable pictures,
         mementos, a diary, an incident log, and computers.

194.     Ms. Bornschein in apartment #20M has a wireless camera in the door of an
         adjacent apartment. The camera is placed in direct view of Ms. Fiderer's door, making it
         easy to monitor every time she leaves or enters her apartment.

I.

203.

195.     Wherefore, plaintiff respectfully requests a judgment of the court against aforementioned defendants, awarding to plaintiff (i) damages in excess of $250,000.00; (ii) pre-and post judgement interest; (iii) costs, including reasonable attorney fees, for this action; (iv) injunctive relief enjoining defendants from continuing the trespass; and (v) any other relief deemed just and equitable by the court.


### G.  Detrimental Reliance

196.     In seeking the assistance of Mr. and Ms. Demeter, plaintiff relied upon the representation of  these defendants that they were competent and able security consultants with considerable exprerience and knowledge.

197.     In contacting the Internal Affairs division of the NYPD, plaintiff relied on the assumption that they would make every effort to have abuses of Mr. Coopersmith cease.

198.     In contacting Jack Timlin of Skyview, plaintiff relied that management would seek to control all criminal activities occurring within the building.  Instead, management aided and abetted criminal behavior of the tenants and workers.

199.     Plaintiff relied in good faith upon representations made by the above defendants.

200.     Plaintiff was justified in her reliance.

201.     Plaintiff relied to her detriment and as a result suffered damages in excess of $250,000.00.

202.     Wherefore, plaintiff respectfully requests a judgment of the court against the defendants awarding to plaintiff (i) damages in excess of $250,000.00; (ii) pre-and post judgment interest; (iii) costs, including reasonable attorney fees, for this action, and (iv) any other relief deemed just and equitable by the court.


### H.  Attempted Murder

203.     All of the defendants participated in a calculated plan to cause Ms. Fiderer severe emotional distress and bodily harm, knowing full well that their acts could result in severe bodily harm and death.  Defendants acted with malice aforethought, and willful and wanton disregard for human life.

204.     At all relevant times, the above defendants' participation in the calculated plan was willful and wanton, and with full knowledge that such conduct was certain to result in permanent injury and or death to Ms. Fiderer.

205.     The conduct of the above defendants constitutes attempted murder of Ms. Fiderer.

206.     As a result of repeated attempts on Ms. Fiderer's life, plaintiff has suffered damages in excess of $250,000.00.

207.     Wherefore, plaintiff respectfully requests judgments of the cost against the above named defendants awarding to plaintiff (i) damages in excess of $250,000.00; (ii) pre-and post judgment interest; (iii) costs, including reasonable attorney fees, for this action; and (iv) any other relief deemed just and equitable by the court.

I.

203.

I.   Violations of Plaintiff's 4th Amendment Right to Privacy

208.     The conduct of the defendants to engage in unwarranted domestic and internet surveillance and issue a National Security Letter against Ms. Fiderer without good cause violated her right to privacy, under the 4th Amendment to the U.S. Constitution, as incorporated to the States through the 14th Amendment.

209.     The conduct of the defendants to engage in unwarranted domestic and internet surveillance and to issue a NSL against plaintiff violated the Communications Act of 1934 and the Electronic Communication Privacy Act (Stored Communications Act) and the plaintiff's right to privacy.

210.     The above named defendants owed Ms. Fiderer a duty not to violate her right to privacy under the aforementioned laws.

211.     The above named defendants breached the duty owed Ms. Fiderer.  As a result of the defendants conduct in violating Ms. Fiderer's privacy, plaintiff has suffered harm and damages in excess of $250,000.00.

212.     Wherefore, plaintiff respectfully requests judgments of the court against all defendants awarding to plaintiff (i) damages in excess of $250,000.00 for each defendant; (ii) pre-and post judgment interest; (iii) costs, including reasonable attorney fees for this action; (iv) injunctive relief enjoining the above named defendants from continuing the invasion of plaintiff's privacy, and (v) any other relief deemed just and equitable by the court.

J.   Violations of FISA and Patriot Act

213.     The conduct of the appropriate defendants to issue an NSL against Ms.. Fiderer and conduct unwarranted domestic, physical, and electronic surveillance of her constitutes a violation of the Foreign Intelligence Surveillance Act of 1978 and the United Stated Patriot Act.

214.     Under the umbrella of the NSL, the above named defendants conducted willful and intentional domestic surveillance of Ms. Fiderer, without probable cause and without a warrant. Ms. Fiderer's phone calls were monitored, her computers hacked into, emails were deleted, computers were stolen, a bank account was opened in her name without her knowledge and consent, personal property stolen, including an incident log, legal papers, her every move was monitored, and she was continually assaulted with chemicals and radiation.

215.     The above named defendants conduct was an invasion of Ms. Fiderer's privacy.

216.     The above named defendants had a duty not to conduct unwarranted surveillance of Ms. Fiderer, to invade her privacy, cause her bodily injury, and attempt to kill her.

217.     The above named defendants breached their duty in relatin to the plaintiff in this matter.

I.

203.

218.    As a result of the defendants' unwarranted surveillance and invasion of privacy, plaintiff suffered harm in excess of $250,000.00.

219.    Wherefore, plaintiff respectfully requests judgment of the court against all of the defendants awarding to plaintiff (i) damages in excess of $250,000.00 (ii) pre-and post judgment interest, (iii) costs, including reasonable attorney fees for this action; (iv) injunctive relief enjoining the above named defendants from continuing to invade plaintiff's privacy, (v) and any other relief deemed just and equitable by the court.

K.   War Crimes Act of 1949/Crimes Against Humanity

220.    The conduct of the defendants to deliberately devise and authorize an unjustified, unwarranted, and fraudulent NSL against Ms. Fiderer without cause and thereby deprive Ms. Fiderer of living a normal life – (i.e. the pursuit of life, liberty, and happiness) constitutes a violation of the War Crimes Act of 1949/crimes against humanity.

221.    The conduct of the defendants to deliberately utilize an unjustified, unwarranted, and fraudulent National Security Letter against Ms. Fiderer to stop her pursuit of justice, constitutes a violation of the War Crimes Act of 1949/and crimes against humanity.

222.    The above defendants had a responsibility not to violate Ms. Fiderer's rights under The War Crimes Act as an innocent American citizen and under the United States Constitution.

223.    The above named defendants acted with willful and wanton disregard for human life.

224.    As a result of the defendants' conduct in depriving Ms. Fiderer of living a normal life, free of continuous monitoring, electronic/surgical torture, and biochemical assaults, plaintiff has suffered harm in excess of $250,000.00.

225.    Wherefore, plaintiff respectfully requests judgments of the court against all defendants awarding to plaintiff (i) damages in excess of $250,000.00 for each defendant: (ii) pre-and post judgment interst; (iii) costs, including reasonable attorney fees for this action, and (v) any other relief deemed just and equitable by the court.

L.   Outrageous Conduct Causing Severe Emotional Distress and Bodily Injury/Outrageous Government Conduct (TORT OF OUTRAGE)

226.    Defendant Lily Tomlin's disturbed obsession with Ms. Fiderer resulting in her continuous stalking of Ms. Fiderer since May 2002 including across state lines, constitutes extreme and outrageous conduct.

227.    Defendants DOD, DOJ, CIA, conduct in illegally issuing a National Security Letter against Ms. Fiderer subjecting her to violent surgical/electronic/radiological/and biochemical assaults, and continuous surveillance without justification was extreme and outrageous.

I.

203.

228.     Defendants Mr. Sorkin, Mr. Wells, Mr. Coopersmith, Skyview and others using the umbrella of the NSL to subject Ms. Fiderer to continuous harassment via surveillance, biochemical assaults, surgical assaults, electronic torture, constitutes extremem and outrageous conduct.

229.     At all relevant times, the defendants' participation in the calculated plan to utilize an NSL was intentional, and with full knowledge that their conduct was certain to result in severe emotional distress, bodily harm, and or death to plaintiff.  Their behavior was comparable to "hit men."

230.     By participating in the plan under the NSL to cause severe emotional distress and bodily harm, the appropriate defendants attempted to cause the death of Ms. Fiderer.

231.     Ms. Fiderer suffered severe emotional distress, suffered permanent bodily damage as a result of the appropriate defendants' participation in the calculated plan under the NSL to cause her extreme pain and suffering, including, but not limited to : memory loss, blindness, continuous pulsatile tinnitus, radiation burns, epistaxis, damaged vocal chords, resulting ins speech difficulties, and loss of bone/cartilage, and collagen.

232.     The conduct of  the appropriate defendants in this matter to cause plaintiff to act to her detriment constitutes intentional infliction of emotional distress , bodily harm and liability to her for her injuries.

233.     As a result of the outrageous conduct and intentional infliction of emotional distress by the defendants, plaintiff has been damaged in excess of $250,000.00.

234.     Wherefore, plaintiff respectfully requests judgments of the court against all of the defendants awarding to plaintiff (i) damages in excess of $250,000.00 for each defendant; (ii) pre-and post judgment interest; (iii) costs, including reasonable attorney fees, for this action, (iv) injunctive relief enjoining all defendants from continuing the intentional infliction of emotional distress; and (v) any other relief deemed just and equitable by the court.

Respectfully submitted,

Deborah E. Fiderer
101 W. 12th St. #7P
New York, NY 10011

By: _Deborah Fiderer_

Deborah E. Fiderer, Individually pro se

DESIGNATION BY TRIAL

I.

203.

Plaintiff designates Manhattan, New Yhork as the location for the trial in this matter. Respectfully submitted,

Deborah E. Fiderer
101 W. 12th St. #7P
New York, NY 10011
By: _Deborah Fiderer_
Deborah Fiderer , Individually pro se

DEMAND FOR A JURY TRIAL

Plaintiff respectfully requests that the issues in this matter be heard by a jury.

Respectfully submitted,

Deborah E. Fiderer
101 W. 12th St. #7P
New York, NY 10011
By: _Deborah Fiderer_

Deborah E. Fiderer, Individually pro se